IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

BERKLEY ASSURANCE COMPANY                                              PLAINTIFF

V.                           CASE NO. 5:23-CV-05042

SPRINDALE PUBLIC SCHOOLS;
MARK OESTERLE;
JOSEPH ROLLINS; and
ALISSA CAWOOD                                                         DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Plaintiff Berkley Assurance Company's ("Berkley") Motion for Summary Judgment (Doc. 32) and Brief in Support (Doc. 33). Defendants Springdale Public Schools ("SPS") and Joseph Rollins filed a Response in Opposition (Doc. 36), to which Berkley replied (Doc. 39). With its Reply, Berkley also filed a Statement of Facts (Doc. 39-1). Defendant Mark Oesterle filed a Response in Opposition (Doc. 34) and a Statement of Facts (Doc. 35), to which Berkley replied (Doc. 37). Defendant Alissa Cawood did not file a response. The Motion is now fully briefed and ripe for decision.

The instant matter arises from an underlying lawsuit filed in this Court by separate Defendant Alissa Cawood, *Cawood v. Springdale School District, et al.*, Case No. 5:22-CV-05225 (W.D. Ark. 2022) (hereinafter the *Cawood* litigation). The filings in that case allege that, beginning in 2015, Mr. Oesterle groomed, stalked, and repeatedly sexually assaulted Ms. Cawood while he was an assistant principal and she was a student at SPS's Har-Ber High School and School of Innovation ("SOI"). Mr. Rollins was principal of SOI during that time. Ms. Cawood further alleges that SPS and Principal Rollins knew about Mr. Oesterle's ongoing misconduct but failed to intervene, effectively sanctioning

1

the abuse by allowing it to continue. On these pleadings, the *Cawood* litigation brings civil rights claims against SPS, Principal Rollins in his individual and official capacities, and Mr. Oesterle in his individual and official capacities under 42 U.S.C. § 1983 and Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88.

In the Motion at bar, Berkley seeks a declaratory judgment that a liability insurance policy it issued to SPS, Policy No. VUMB0238921 ("the Policy"), does not create a duty to defend or indemnify Mr. Oesterle, SPS, and Principal Rollins from the *Cawood* litigation. Berkley advances several theories to this effect, each of which Mr. Oesterle, SPS, and Principal Rollins dispute. However, for the reasons explained below, the Court finds that Berkley's duties to defend and indemnify turn on the Policy's prior knowledge exclusion and declines to reach the parties' other arguments. The Court further finds that the *Cawood* litigation triggers the prior knowledge exclusion; consequently, Berkley prevails as a matter of law and its Motion for Summary Judgment is **GRANTED**.

## I. BACKGROUND

For the purposes of summary judgment, this case turns on three undisputed facts: (1) Berkley issued the Policy to SPS, effective March 1, 2022, to March 1, 2023, which contained a prior knowledge exclusion. (Doc. 2-2, pp. 7–8). (2) In the *Cawood* litigation, Ms. Cawood pleaded allegations in her Complaint (Doc. 33-1 (filed November 1, 2022) [hereinafter *Cawood* Initial Complaint]) and First Amended Complaint (Doc. 33-2 (filed January 12, 2023) [hereinafter the *Cawood* FAC]) that are material to the Policy's prior knowledge exclusion.[1] And (3) SPS first gave Berkley notice of those allegations when it

---

[1] Both the *Cawood* Initial Complaint and *Cawood* FAC plead facts that are material to the exclusion. However, for clarity, the Court will cite only to the *Cawood* FAC going forward.

sent Berkley a copy of the *Cawood* Initial Complaint, on or around November 3, 2022.
The Court makes detailed findings on each undisputed fact below.

## A. The Policy

During its one-year coverage term, the Policy provided SPS with School Board
Legal Liability and Employment Practices Liability Coverage on a claims-made and
reported basis. The relevant terms of the Policy are twofold. First, the Policy's "Insuring
Agreement" section establishes SPS's School Board Liability coverage:

### I. Insuring Agreement

### COVERAGE A — SCHOOL BOARD LIABILITY

> The Company will pay on behalf of the INSURED all LOSS which
> the INSURED shall become legally obligated to pay as damages to
> which this insurance applies, as a result of CLAIMS first made and
> reported to the Company during the POLICY YEAR . . . against the
> INSURED by reason of WRONGFUL ACT(S).

(Doc. 2-2, p. 10). The Policy further explains the meaning of the coverage provision in its
"DEFINITIONS" section. *See id.* at pp. 13–15.

- "INSURED" includes "the schools under the jurisdiction of the NAMED INSURED";
  "employees and volunteers of the NAMED INSURED"; and "any elected,
  appointed, or employed officials of a NAMED INSURED." *Id.* at p. 14. "Springdale
  Public Schools" is the NAMED INSURED. *Id.* at p. 7.

- "LOSS" means "any amount which the INSURED is legally obligated to pay for any
  CLAIM first made against the INSURED during the POLICY YEAR . . . for a
  WRONGFUL ACT(S) . . . ." *Id.* at p. 14.

- "CLAIMS" include "a civil proceeding against any INSURED seeking monetary
  damages or non-monetary or injunctive relief, commenced by the service of a
  complaint or similar pleading . . . ." *Id.* at p. 13.

- WRONGFUL ACT(S) are defined as:

  > any actual or alleged . . . acts or omissions, neglect or breach of duty,
  > individually or collectively, arising from the operation of the NAMED
  > INSURED'S operation, school, educational or extracurricular program, or
  > any matter claimed against the INSUREDS solely by reason of their being

3

or having been INSUREDS during the POLICY YEAR, and committed solely in the performance of duties for the NAMED INSURED.

*Id.* at p. 15.

Second, the Policy contains the following prior knowledge exclusion:

**VII. EXCLUSIONS**

**A. COVERAGE A . . . EXCLUSIONS**

The Company shall not make any payment for any LOSS or LOSS ADJUSTMENT EXPENSE or defend any CLAIMS made against the INSURED under Coverage A – SCHOOL BOARD LEGAL LIABILITY . . . :

. . . .

**5.** Arising from any circumstance(s) or incident(s) which might reasonably be expected to give rise to a CLAIM hereunder, which is either known or reasonably should have been known to the INSURED prior to the Inception of this policy and not disclosed to the Company prior to inception.

*Id.* at p. 15.

SPS signed and submitted to Berkley an application for coverage under the Policy on February 8, 2022. The application contained several questions and responses related to disclosures of prior knowledge. First, it asked:

**IV.  CLAIMS  HISTORY – INCIDENTS – INSURED/UNINSURED LOSSES – CURRENT AND PRIOR TWO (2) YEARS**

. . . .

2.    Is the applicant aware of any claims, acts, omissions, incidents or circumstances which might reasonably be expected to give rise to a claim?

(Doc. 33-4, p. 3). SPS answered "yes" to this question. In a subsequent section, the application prompted SPS to explain its answer:

**SECTION VII. Claims Information**

. . . .

4

2.  Has any claim been made in the past five years or is now pending against any person in their capacity as an official or employee of the entity?

. . . .

7.  Has a person alleged sexual molestation/abuse against any: Student? Employee? Other?

*Id.* at p. 7. SPS responded "no" to question 2. In response to question 7, SPS indicated that there had been allegations of sexual molestation/abuse against a student, but not against an employee or any other person. *See id.* On the next page, SPS elaborated: "We have had students accuse other students of inappropriate contact." *Id.* at p. 8.

Finally, just above the signature line, the application included an attestation "that no fact, circumstances, or situation indicating the probability of a claim or action now known to any public official or employee has not been declared; and it is agreed by all concerned that omission of such information shall exclude any such claim . . . ." *Id.* at pp. 7–8. SPS signed the application without mention of the allegations against Mr. Oesterle or any other incidents, events, or circumstances that might have reasonably been expected to give rise to a claim.

## B. The *Cawood* Litigation

### 1. Mr. Oesterle's Alleged Misconduct[2]

SPS hired Mr. Oesterle as an assistant principal at Har-Ber High School in 2014. He transferred to SOI for the 2015–2016 school year and was employed by SPS as

---

[2] To avoid confusion, the Court reiterates that the facts in this and the following section are merely alleged. However, as the Court will discuss below, the allegations are themselves material.

assistant principal there until late 2016, when he transferred to another position in Fayetteville Public Schools.

Mr. Oesterle first took an interest in Ms. Cawood in August of 2015, when she was 13 years old and entering her eighth-grade year at SOI. Mr. Oesterle began grooming her then. He asked for her phone number and messaged her privately on text and social media platforms. He picked her up from school, took her out to lunch, and brought her home. And he began to confide in Ms. Cawood about his life and marriage, divulging explicit information about his extramarital affairs. Ms. Cawood lived under the guardianship of her grandparents, who neither knew of nor consented to Mr. Oesterle's contact with their granddaughter.

At SOI, Mr. Oesterle's misconduct escalated from grooming to molestation. Numerous students and teachers noticed that he would lock his office door and cover its window with a sheet of paper when Ms. Cawood and other female students were inside. Mr. Oesterle used his veiled office to sexually abuse minor female students. The *Cawood* FAC details the account of a named victim, S.W., who "reported to her classmates that it was during this time in his office that she and Oesterle would have sexual intercourse." (Doc. 33-2, ¶ 17).

Manipulation, too, was part and parcel to Mr. Oesterle's alleged misconduct. The female students he targeted—thin, Caucasian minors—were permitted to miss their classes to spend time alone with him in his office or to leave campus altogether. Mr. Oesterle prohibited teachers from documenting these absences. He also began altering these students' grades. S.W. stated that during the time she was victimized by Mr.

Oesterle in this manner, she was failing her classes due to missed class time. She further stated that Mr. Oesterle changed her grades to passing "in exchange for sex." *Id.* at ¶ 28.

As the 2015-2016 school year progressed, Mr. Oesterle's misconduct intensified and spread beyond the concealment of his office:

> Oesterle's predatory behavior became more physically aggressive. On at least thirty (30) separate occasions, he groped Alissa's breasts or her buttocks, including at least fifteen (15) instances on SOI's campus. Oesterle would slide his hands along Alissa's thighs and "smack her butt" while on SOI school grounds. He would frequently hug her, and nearly every time, he would use the hug as an opportunity to touch her bottom and to cup her breasts with his hands, to the point of his fingers touching the sides of her nipples. Oesterle regularly subjected Alissa and other Students to "front hugs" with full body contact, sometimes lasting as long as 15–20 seconds. This took place every day or two at SOI.

*Id.* at ¶ 19.

In the summer of 2016, when Ms. Cawood was 14 years old and between eighth and ninth grade, Mr. Oesterle's misconduct escalated further still. He "made innuendos, offered to send her photos of his genitals, made sexual comments about her appearance, and attempted other inappropriate verbal assaults." *Id.* at ¶ 33. And Mr. Oesterle began to follow her. He used Ms. Cawood and her classmates' social media accounts to determine her whereabouts and turned up uninvited at her home and after-school job. This pattern of stalking continued throughout the 2016-2017 school year, even after Mr. Oesterle transferred to Fayetteville Public Schools.

By the 2017-2018 school year, Mr. Oesterle's misconduct had reached a terrible crescendo. The *Cawood* FAC alleges that he used Snapchat to describe graphic, often violent sexual fantasies to her, and offered to pay her to enact those fantasies. He continued to stalk her at her home and place of work. He threatened to kill Ms. Cawood and her family if she ever reported him.

In December of 2018, as was his alleged custom, Mr. Oesterle showed up at Ms. Cawood's job at Barnes & Noble and groped her breast in front of other patrons. She was 16 years old then and had recently blocked Mr. Oesterle on social media for being "violently graphic." *Id.* at ¶ 47. The episode was reported to law enforcement, and he was eventually arrested and charged with three counts of sexual assault in the second degree. Only when presented with a subsequent no-contact order did his abuse relent.

Mr. Oesterle pleaded guilty to one count of sexual assault in the second degree and was sentenced by the Circuit Court of Washington County on September 16, 2021. (Doc. 33-5). The sentencing order lists three minor female victims of Mr. Oesterle's offense conduct, which occurred in August or September of 2015. They were aged 13 to 14. The *Cawood* FAC maintains that she was one of them.

### 2. SPS and Principal Rollins's Alleged Knowledge

The *Cawood* FAC further alleges that Defendants SPS and Rollins had knowledge of Mr. Oesterle's sexual misconduct, and that his misconduct was so frequent and brazen that knowledge of it was widespread amongst SOI's faculty and leadership. Specifically, the *Cawood* FAC pleads that numerous faculty and staff reported Mr. Oesterle's misconduct to Principal Rollins, and names eight faculty members who did so (Dr. Marian Hendrickson, Tim Smithey, Rebecca Pugh, Debbie Huston, Cindy Lyons, Renee Treat, Jason House, and Alissa Corke).

During the 2015-2016 school year, for example, "[n]umerous students and teachers reported" to Principal Rollins that Mr. Oesterle was concealing himself in his office with female students, and that they believed his purpose to be sexual abuse. (Doc. 33-2, ¶ 17). In one such episode, Dr. Hendrickson, a teacher at SOI, opened the closed

door to Mr. Oesterle's office and found him sitting on a couch with three female students, one of them on his lap. She reported this conduct to Principal Rollins, "providing more than enough details for Rollins to form his own suspicions and beliefs that Oesterle was sexually abusing underage female students." *Id.* at ¶ 18. SOI instructor Tim Smithey also informed Principal Rollins that Mr. Oesterle "was spending extensive time alone in his office with particular female students and permitting them to miss class" on more than one occasion in December of 2015. *Id.* at ¶ 27. In 2016, Ms. Cawood's grandfather reported Mr. Oesterle's stalking behavior to Principal Rollins in a phone call and expressed to him suspicions that Ms. Cawood was being sexually abused.

Mr. Oesterle's conduct was also reported to SPS leadership. In May of 2017, an alarmed SOI teacher sent a photo that Ms. Cawood had posted of herself in Mr. Oesterle's vehicle to Jared Cleveland, assistant superintendent for SPS. Mr. Cleveland sent the photo to Principal Rollins with instructions to "deal with it." *Id.* at ¶ 41. Principal Rollins responded by removing Ms. Cawood from class the next day and insisting that she write and sign a statement disavowing claims that Mr. Oesterle was her abuser.

The *Cawood* FAC summarizes Principal Rollins's alleged knowledge as follows: "Principal Rollins, SOI's top official and policymaker, displayed deliberate indifference to the actual notice that had been provided him by multiple witnesses, including teachers, coaches, and parents of Oesterle's sexual misconduct, including violations of students' bodily integrity." *Id.* at ¶ 43. And it distills the alleged SOI faculty reports to SPS leadership this way:

> These reports were not vague; there was never a doubt in anyone's mind that the danger being reported related to child sexual abuse . . . . The amount of notice provided by all of these witnesses to Rollins, to the superintendent, and, upon information and belief, to the board, was so

overwhelming that any reasonable person on the receiving end of this notice would have to believe Oesterle was likely engaging in illegal sexual conduct with young girls attending SOI, including Plaintiff.

*Id.* at ¶ 38. In sum, the *Cawood* FAC claims that knowledge of Mr. Oesterle's sexual misconduct was "near universal" among SOI's faculty and SPS leadership. *Id.*

### C. Notice of Defendant Oesterle's Misconduct

Finally, it is undisputed that SPS did not notify Berkley of these allegations until it sent Berkley the *Cawood* Initial Complaint, shortly after it was filed on November 1, 2022.

### II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).

Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). "[T]he mere existence of a scintilla  of evidence in support of the [moving party's] position will be insufficient" to survive summary  judgment. *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Rather, for there to

be a genuine issue of material fact that would preclude summary judgment, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Liberty Lobby, Inc.,* 477 U.S. at 248).

### III. DISCUSSION

In Arkansas, "[t]he duty to defend and the duty to indemnify 'are distinct, independent obligations.'" *Safeco Ins. Co. of Am. v. Dooms*, 617 F. Supp. 3d 980, 989 (W.D. Ark. 2022) (quoting *S. Farm Bureau Cas. Ins. Co. v. Watkins*, 2011 Ark. App. 388, 7 (2011)). The Court "must first apply the test for determining a liability carrier's duty to defend." *Scottsdale Ins. Co. v. Morrowland Valley Co., LLC*, 2012 Ark. 247, 9 (2012) (citing *Murphy Oil USA, Inc. v. Unigard Sec. Ins. Co.*, 347 Ark. 167, 175 (2001)).

### A. Duty to Defend

"As a general rule . . . the pleadings against the insured determine the insurer's duty to defend." *Kolbek v. Truck Ins. Exch.*, 2014 Ark. 108, 6 (2014) (citing *Murphy Oil*, 347 Ark. at 175–76 (collecting cases)). "Because the duty to defend is based only on the allegations in the underlying pleadings, it 'is broader than the duty to indemnify.'" *Dooms*, 617 F. Supp. 3d at 989–90 (quoting *Kolbek*, 2014 Ark. at 6). "To trigger a duty to defend . . . the complaint must allege facts that would come within the coverage of the policy." *Scottsdale Ins. Co.*, 2012 Ark. 247 at 9 (citing *Murphy Oil*, 347 Ark. at 176). "[W]hen there is a possibility that the injury or damage [may] fall within the policy coverage," the duty to defend arises. *Kolbek*, 2014 Ark. at 6 (citing *Murphy Oil*, 347 Ark. at 176). But "[w]here there is no possibility that the damage alleged in the complaint may fall within the policy coverage, there is no duty to defend." *Id.*

11

The question presented, then, is whether the *Cawood* FAC alleges facts which could fall within the coverage of the Berkley Policy. Berkley argues that it does not, citing the Policy's prior knowledge exclusion. As recited in Section I.A, *supra*, that exclusion provides:

> The Company shall not . . . defend any CLAIMS . . . [a]rising from any circumstance(s) or incident(s) which might reasonably be expected to give rise to a CLAIM hereunder, which is either known or reasonably should have been known to the INSURED prior to the Inception of this policy and not disclosed to the Company prior to inception.

(Doc. 2-2, p. 15). The Policy defines "CLAIMS" to include "a civil proceeding against any INSURED seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading . . . ." *Id.* at p. 13. And pursuant to its prior knowledge exclusion, the Policy application includes several questions prompting applicants to declare any acts, omissions, incidents, circumstances, allegations, or litigations which might reasonably be expected to give rise to such claims. *See* Doc. 33-4, p. 3, 7–8; Section I.A, *supra*.

This Court recently explained in *EMCASCO Ins. Co. v. NWA Grounds Servs., LLC*, 2023 WL 3440312 (W.D. Ark. May 12, 2023), that a provision requiring an insured to disclose or otherwise give notice of claims to the insurer often amounts to a condition precedent to coverage under an insurance contract. Generally, "[t]he duty to give notice arises when, under the circumstances, the insured has reason to know of the possibility of an impending claim, regardless of whether the insured believes that he or she is liable, or that the claim is valid." *Id.* at *4 (quoting 1 Samuel Williston, A Treatise on the Law of Contracts § 49.88 (4th ed. 1990)).  "If an insurance policy treats the giving of notice of a lawsuit as a condition precedent to recovery, 'the insured must strictly comply with the notice requirement, or risk forfeiting the right to recover from the insurance company.'"

12

*Am. Railcar Indus., Inc. v. Hartford Ins. Co. of the Midwest*, 847 F.3d 970, 973 (8th Cir. 2017) (quoting *Fireman's Fund Ins. Co. v. Care Mgmt., Inc.*, 2010 Ark. 110, 5–6 (2010)). "In other words, an insured must comply with contractual conditions precedent before the insurer has any contractual duties to defend or indemnify." *EMCASCO*, 2023 WL 3440312 at \*4. Like the notice provision at issue in *EMASCO*, the prior knowledge exclusion here operates as a condition precedent to coverage. Claims that fall within its terms are barred from coverage as a threshold matter.

In *Platte River Ins. Co. v. Baptist Health*, our sister court considered whether prior knowledge questions are to be judged under an objective or subjective standard, and adopted the objective approach, following the majority position. 2009 WL 2015102, at \*13–15 (E.D. Ark. Apr. 17, 2009) (collecting and analyzing cases). Here, the Policy's prior knowledge exclusion uses exclusively objective language, it bars claims:

> "[a]rising from any circumstance(s) or incident(s) which *might reasonably be expected* to give rise to a CLAIM hereunder, which is *either known or reasonably should have been known* to the INSURED prior to the Inception of this policy and not disclosed."

(Doc. 2-2, p. 15 (emphasis added)). Accordingly, the Court will follow *Platte River*'s objective approach. As applied, the narrow question is whether, on the pleadings in the *Cawood* litigation, SPS, its employees or officials, knew or reasonably should have known of any prior circumstance(s) or incident(s) which might reasonably have been expected to give rise to the *Cawood* litigation under the Policy and were not disclosed to Berkley prior to the Policy's inception. *See id.* at pp. 14–15.

The unequivocal answer is yes. The *Cawood* FAC brings one claim against Mr. Oesterle and three claims against Principal Rollins and SPS. Count I is a Fourteenth

13

Amendment claim against Mr. Oesterle under 42 U.S.C. § 1983 that is predicated, *inter alia*, on the following alleged conduct:

> During Alissa Cawood's time as a student at SOI, *Mark Oesterle's repeated sexual harassment and sexual assault of Alissa* established a custom on the part of Springdale School District that evidenced a deliberate indifference toward Plaintiff's constitutional right to bodily integrity. *The custom established by Oesterle permitted Alissa Cawood to be sexually assaulted on at least thirty (30) occasions, including at least fifteen (15) instances occurring on Springdale School District grounds, thereby violating her right to bodily integrity. This custom also permitted Oesterle to groom, stalk, and harass Alissa Cawood with impunity for three (3) years, allowing him to obtain sexual gratification from communicating his sexual desires to an underaged and vulnerable student, to threaten that student, and to convince that student that he was protected by the District and there was nothing she could do about it.*

(Doc. 33-2, ¶¶ 56–57 (emphasis added)). Count II brings the same section 1983 claim against Mr. Rollins, alleging the following conduct:

> During Alissa Cawood's time as a student at SOI, Joseph Rollins'[s] repeated practice of failing to adequately investigate, suppressing, and ultimately ignoring all *reports regarding inappropriate behavior of an administration member toward a student* reflects a custom on the part of Springdale School District of deliberate indifference toward violations of Plaintiff's constitutional right to bodily integrity.

*Id.* at ¶ 66 (emphasis added). And Count III brings the section 1983 claim against SPS, alleging related conduct:

> Springdale School District *observed a custom* whereby a male administrator could harass, discriminate against, and molest female students with impunity. . . . Furthermore, *Principal Rollins and Superintendent Cleveland received numerous reports of Oesterle engaged in conduct amounting to violations of students' well-established right to bodily integrity, including using his excessive "hugging" as an opportunity to feel students' breasts and realize his own sexual gratification*.

*Id.* at ¶¶ 71–72 (emphasis added). Finally, Count IV brings a claim against SPS under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88, alleging:

14

> Springdale School District was deliberately indifferent to *known acts of sexual discrimination by Mark Oesterle against Alissa Cawood, of which it had actual knowledge, and which largely occurred under the school district's control* — on the physical grounds of the educational institution and while Oesterle was employed by the school district.

*Id.* at ¶ 79 (emphasis added). As indicated by the Court's emphases above, each of these claims is predicated on *prior knowledge*.

The Court finds that the conduct alleged clearly precludes Berkley from a duty to defend Mr. Oesterle, SPS, and Principal Rollins under the Policy's prior knowledge exclusion. Mr. Oesterle argues that because *some* of the allegations against him would not have put him on notice that a claim may be brought, he "at the very least, could[ ]be entitled to coverage." (Doc. 34, p. 7 (summarizing such allegations as "talking about his personal life with Cawood, giving Cawood rides . . . , hugging Cawood . . . , and showing up to meet Cawood")). This argument is unpersuasive. As Mr. Oesterle concedes, "[g]roping a student and offering to pay a student for sex have a level of intent that would put Oesterle on notice (i.e., impute knowledge to him) of a potential claim . . . so as to fall under the knowledge exclusion set forth in Berkley motion." *Id.* at p. 6. *Those* are the operative allegations in the section 1983 against Mr. Oesterle, and those are the allegations preclude him from coverage under the Policy. Mr. Oesterle cannot sidestep the prior knowledge exclusion with inoperative facts. An abuser has prior knowledge of his own misconduct, and Mr. Oesterle is the alleged abuser here.

Moreover, the claims against SPS and Principal Rollins in the *Cawood* FAC are expressly premised on their knowledge of Mr. Oesterle's misdeeds, knowledge which allegedly dates back to 2015–2016. The Court finds it eminently reasonable to conclude that Mr. Oesterle's sexual misconduct against minor female students—which is alleged to have occurred for approximately eighteen months while he was employed by SPS as

an assistant principal, included over fifteen instances of groping on SOI's campus against Ms. Cawood alone, led at least eight faculty members to report his misconduct to Principal Rollins, culminated in "near universal knowledge of this scandal within the Springdale School District" (Doc. 32-2, ¶ 38), and which did, in fact, lead to his arrest and conviction for sexual assault (Doc. 33-5)—might give rise to a claim under the Policy. The Court thus finds, as a matter of law, that these allegations trigger the prior knowledge exclusion.

Defendants SPS and Rollins counter that Berkley has "simply recite[d] the allegations of the underlying complaint as fact," all the while "cherry pick[ing] their version of the facts to support their denial of the claim," and maintains that they "had no written or verbal notice of a claim to report to Berkley prior to the filing of Cawood's lawsuit." (Doc. 36, p. 4–5). But in so arguing, Defendants misstate or misunderstand the law under *Murphy Oil*. The Court need not find that the allegations pleaded in the *Cawood* FAC are true to conduct its duty-to-defend analysis—and does not so find here. *State Volunteer Mut. Ins. Co. v. Rosenschein*, 552 F. Supp. 3d 828, 832 (W.D. Ark. 2021) (quoting *Fisher v. Travelers Indem. Co.*, 240 Ark. 273, 274 (1966)) ("It is well settled that the allegations in a complaint, whether groundless or false, determine the obligation of the insurer to defend its insured within the coverage of the policy."). Rather, the Court racks its focus to whether Berkley could possibly owe a duty to defend based upon the facts alleged. *Murphy Oil*, 347 Ark. at 180. Here, because SPS and Principal Rollins's alleged liability is directly tied to their prior knowledge of Mr. Oesterle's sexual misconduct, there is "*no possibility* that the damage alleged in the complaint may fall within the policy coverage." *Kolbek*, 2014 Ark. at 6 (emphasis added) (citing *Murphy Oil*, 347 Ark. at 176). For these

reasons, the Court finds that Berkley owes no duty to defend Mr. Oesterle, SPS, or Principal Rollins.

### B. Duty to Indemnify

Next, the Court turns to whether Berkley owes a duty to indemnify Mr. Oesterle, SPS, and Principal Rollins from liability in the *Cawood* litigation. Insurers have a duty to indemnify "if the proved facts show an event occurred for which coverage applies." *Dooms*, 617 F. Supp. 3d at 990. The duty to indemnify turns not on the pleadings but on "the actual facts and circumstances giving rise to liability in the underlying suit." 43 Am. Jur. 2d Insurance § 676 (2022) (collecting cases). However, "[c]ourts are permitted to rule on an insurer's duty to indemnify before the insured's liability has been established in the underlying lawsuit." *Dooms*, 617 F. Supp. 3d at 990 (citing *Kolbek*, 2014 Ark. at 9–10).

Turning from the pleadings to the facts cannot unbind Mr. Oesterle, SPS, and Principal Rollins from the unambiguous language of the prior knowledge exclusion. They remain snared in a catch-22 of their own making: If the facts alleged in the *Cawood* FAC are true, then their prior knowledge bars coverage. And if those facts are false, then there will be no liability. There is thus *no possibility* that the facts pleaded, whether alleged or proven, could fall within Berkley's liability coverage.

For these reasons, the Court finds that Berkley owes no duty to indemnify Mr. Oesterle, SPS, or Principal Rollins from liability in the *Cawood* litigation as a matter of law. On the undisputed facts at bar—arising from the Policy, the *Cawood* FAC, and SPS's failure to notify Berkley of Mr. Oesterle's alleged misconduct prior to the Policy's inception—no reasonable factfinder could conclude that a duty to defend or indemnify survives the Policy's prior knowledge exclusion. Courts "are not required by the rules of

contractual construction to stretch our imaginations to create coverage where none exists," *Pate v. U.S. Fid. & Guar. Co.*, 14 Ark. App. 133, 136 (1985), and none exists here.

### IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff Berkley Assurance Company's Motion for Summary Judgment (Doc. 32) is **GRANTED**. Judgment will issue concurrently with this Opinion.

**IT IS SO ORDERED** on this 17th day of February, 2024.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE